UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
LYNDA BYRD,

                    Plaintiff,

                                             MEMORANDUM & ORDER
           -against-                         12-CV-2211(JS)

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                    Defendant.
-----------------------------------X
APPEARANCES
For Plaintiff:      Lynda Byrd, pro se
                    P.O. Box 5594
                    Hempstead, NY 11550

For Defendant:      Robert W. Schumacher, II, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    610 Federal Plaza, 5th Floor
                    Central Islip, NY 11722

SEYBERT, District Judge:

          Plaintiff Lynda Byrd ("Plaintiff") commenced this

action pro se pursuant to Section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), and Section 1631(c)(3) of

the Social Security Act, as amended, 42 U.S.C. § 1383(c),

challenging Defendant Commissioner of Social Security's

("Defendant" or the "Commissioner") denial of her application

for disability insurance benefits ("DIB") and Supplemental

Security Income ("SSI").

Presently before the Court is the Defendant's motion for judgment on the pleadings. For the following reasons, Defendant's motion is GRANTED.

BACKGROUND

Plaintiff worked as a security guard at the Probation Department in Mineola, New York. (Def.'s Br., Docket Entry 20, at 2.) On March 16, 2007, Plaintiff tripped over wires and fell while on the job as a security officer for the Mineola probation department. (R. 121.)[1] She was taken by ambulance to the emergency room and reported injuries to her neck, right shoulder, right groin, lower back, right foot, and right hip. (R. 173.) She applied for DIB and SSI on December 2, 2009 (R. 46) and December 9, 2009 (R. 45) asserting that carpal tunnel syndrome and back, shoulder, neck, foot, and hip pain limited her ability to work as of November 4, 2009 (R. 96). Plaintiff's application was denied on March 3, 2010. (R. 47.) On March 22, 2010, Plaintiff requested a hearing, which took place on December 30, 2010 before Administrative Law Judge ("ALJ") Jay Cohen. (R. 13, 24.) Plaintiff was represented by counsel and was the only witness to testify before the ALJ. (R. 24-44.)

Plaintiff received an unfavorable decision by the ALJ on February 11, 2011 (R. 10) and filed an appeal with the

_____

[1] "R." denotes the administrative record which was filed by the Commissioner on July 30, 2012 and October 4, 2012. (Docket Entries 13, 18.)

Appeals Council of the Office of Disability Adjudication and Review on March 15, 2011 (R. 7). The Appeals Council denied Plaintiff's request for review on March 22, 2012, making the decision of the ALJ the final decision of the Commissioner. (R. 1.)

The Court will first summarize the relevant evidence that was presented to the ALJ, followed by a discussion of the ALJ's findings and conclusions as well as the Appeals Council's decision.

## I. Non-Medical Evidence

Plaintiff, who was born in 1969, was 40 years old at the time of her onset date. (R. 74.) At her hearing on December 30, 2010, Plaintiff indicated that she lives alone on the first floor of an apartment building in Hempstead, New York where she has lived for around four years. (R. 28.) Plaintiff attended high school through the ninth grade and her only vocational education consisted of a three-week home health aid course. (R. 28.) Plaintiff testified that she sometimes does her own cooking, has help cleaning, and does not shop but sends a friend to shop for her (R. 39-40), though she apparently reported to Dr. Peter Stefanides that she shops once per month (R. 208). Plaintiff testified that although she used to jog and exercise, she can no longer do those activities except to take

her dog for short walks. (R. 40-41.) She does not visit friends or relatives and rarely goes outside. (R. 40-41.)

Plaintiff testified that before work each day she relaxes until she sees her doctor at 2 p.m., and at about 3 p.m. she takes the bus to work. (R. 39.) As she has not driven a car since 2007, she takes public transportation, but testified that holding the rail on the bus causes her arm to pull and her neck to cramp when the bus stops. (R. 41.) Plaintiff also testified that she is in pain all of the time (R. 41) and that her injuries prevent her from lifting a gallon of milk, standing longer than twenty-five minutes, sitting longer than thirty minutes without cramping, or walking far (R. 32-33).

Plaintiff began her employment as a security officer in 2000, and did not indicate in a work history report any employment prior to 2000.[2] (R. 88.) She currently works as a security guard at the Probation Department in Mineola, New York where her responsibilities include searching people's property before they go through metal detectors. (R. 29.) Prior to her alleged onset date, Plaintiff states that she would frequently lift the belongings she was searching (up to twenty-five pounds), and would walk, stand, sit, stoop, kneel, crouch,

---

[2] Plaintiff's FICA Summary indicates additional earnings between 1996 and 1999 of less than $5,200 per year from an unspecified source (R. 81), but Plaintiff's Social Security application indicated no employment during that time (R. 88).

reach, and write, type or handle small objects throughout her entire eight-hour workday. (R. 89, 97.) She testified that she no longer lifts the belongings as she searches them to avoid straining her shoulder and neck. (R. 30-31.)

After her March 16, 2007 accident, Plaintiff was out of work until March 2008 and stopped work again between March 2009 and May 2009 for surgery. (R. 96.) After resuming work as a security officer in June 2009, Plaintiff again became unable to work on November 4, 2009. (R. 96.) From July 2010 through the time of the ALJ hearing, Plaintiff had resumed working part-time as a security guard. (R. 29.) According to her testimony, she works between twenty and twenty-eight hours per week and is paid $12.29 per hour. (R. 28-29.)

## II. Medical Evidence Prior To The Alleged Onset Date

Plaintiff was taken by ambulance to Franklin General Hospital immediately after she was injured at work on March 16, 2007. (R. 173.) At the hospital, doctors x-rayed Plaintiff, prescribed her Motrin, and discharged her the same day. (R. 173.)

On May 10, 2007, a magnetic resonance imaging ("MRI") of Plaintiff's right shoulder and cervical spine showed "[a]cromion impingement on the supraspinatus muscle" and "[i]ncreased signal in the supraspinatus tendon consistent with

a tendinopathy," and "a subligamentous posterior disc herniation at C6-7." (R. 130-31.)

Plaintiff saw Dr. Robert Michaels, M.D. of Western Nassau Orthopaedic Association on May 25, 2007 and complained of difficulty using her right shoulder, numbness and tingling radiating down the right arm, and night pain. (R. 164, 171.) Upon physical examination, Dr. Michaels indicated that Plaintiff had a "weakly positive impingement sign, mild restriction in forward elevation and internal rotation, but other motions are full." (R. 164.) After taking x-rays, Dr. Michaels ruled out fracture, dislocation, or osseous pathology, but indicated that the x-ray did show Type II acromial morphology. (R. 164.) Referring to Plaintiff's MRI report, Dr. Michaels repeated that Plaintiff had "acromial impingement of the supraspinatus and some tendinopathy, but there is no tear." (R. 164.) He diagnosed her with "[r]ight shoulder derangement with impingement," and "[p]ossible cervical radiculopathy," and injected her right shoulder with Depo-Medrol and Carbocaine for therapeutic and diagnostic purposes. (R. 164.) At that time, it was Dr. Michaels' opinion that Plaintiff was completely disabled from returning to her occupation. (R. 164.)

Dr. Michaels reported in July of 2007 that Plaintiff's shoulder pain had lessened owing to the May injections, but that she now complains of pain extending from the clavicle to the

anterior chest wall with occasional numbness and tingling down the arm, exacerbated by neck motion. (R. 165.) Dr. Michaels' diagnosis remained the same, and he indicated that her symptoms were likely coming from the neck. (R. 165.) Her shoulder pain returned in August 2007 and Dr. Michaels gave her another Depo-Medrol injection and ordered an Electromyography ("EMG") to determine whether shoulder arthroscopy would have any potential benefit. (R. 166.)

The EMG showed no evidence of cervical radiculopathy, and in February 2008, Plaintiff had no rotator cuff weakness. (R. 166.) At that time, Dr. Michaels reported that some of Plaintiff's pain continued after the injections and her physical examinations showed mild restriction in motion and discomfort elicited from supraspinatus testing. (R. 166.) He recommended a right shoulder arthroscopy, decompression, a Mumford procedure, and possible rotator cuff repair. (R. 167.) Dr. Michaels referred Plaintiff to Dr. Peter Langan, M.D. for these procedures. (R. 168.)

Plaintiff underwent a right shoulder arthroscopy with decompression on March 17, 2009 with Dr. Langan. (R. 134.) His post-operative diagnosis revealed that Plaintiff had a small partial thickness tear of the rotator cuff, rotator cuff tendinitis, and impingement. (R. 149.)

In his examinations after the surgery, Dr. Langan indicated a good early range of motion and started Plaintiff on physical therapy. (R. 169.) On April 27, 2009, he indicated that Plaintiff could easily abduct her arm to ninety degrees but should stop doing so out of his presence and continue to wear a sling. (R. 169.) During that visit Plaintiff reported that she had some tearing when lifting her arm, but after x-raying her, Dr. Langan found no dislodgement or evidence of distraction in the area that bothered her. (R. 169.)

By May 2009, Dr. Langan thought Plaintiff could continue therapy with unlimited range of motion, and on June 4, 2009 he reported that she could return to work. (R. 169-70.)

Meanwhile, Plaintiff also sought the care of a chiropractor. She first saw Dr. Raymond Jaghab, a chiropractor for West Hempstead Neck and Spinal Chiropractic Office, in March 2007 complaining of an injury to her neck, right shoulder, right groin, lower back, right foot, and right hip. (R. 173.) The record shows that Dr. Jaghab treated Plaintiff regularly between October 2008 and September 2009. (R. 173-96.) During these visits, Dr. Jaghab performed manual spinal manipulation and adjunctive therapy. (R. 175-96.) In his progress reports, Dr. Jaghab never indicated the level at which Plaintiff was impaired or described any work restrictions she might have aside from noting that between October 2008 and December 2008 Plaintiff

would have no work restrictions. (R. 175-96.) He diagnosed Plaintiff with "multiple cervical vertebra subluxation, cervical radiculitis, thoracic sprain/strain, and lumbar sprain/strain." (R. 173.)

In October 2008, and again in February 2009, Dr. Jaghab referred Plaintiff to chiropractor Dr. Mark Soffer for a voltage-actuated sensory nerve conduction threshold ("V-sNCT") test in order to evaluate and study Plaintiff's subjective complaints. (R. 238.) The October 2008 V-sNCT tested Plaintiff's cervical nerve sites and detected "marked hypoesthesia" in the C7 Right/Radial Nerve Med. Branch and "severe-very severe hypoesthesia" in the C8 Left/Ulnar Nerve, supporting an electrophysiological diagnosis of cervical radiculopathy. (R. 233.) The February 4, 2008 V-sNCT tested Plaintiff's lumbar nerve sites and detected "very severe hypoesthesia" at the L3 Right/Femoral Cutaneous Nerve, supporting a clinical diagnosis of lumbar radiculopathy. (R. 236.) After both V-sNCT tests, Dr. Soffer indicated that the "findings objectively document the sensory symptomotology described by the patient." (R. 233, 236.)

In September 2009, Plaintiff had a consultation with internist Dr. Tonuca Basu, at which time Plaintiff complained of painful headaches, neck pain, mid-back pain, right shoulder pain, and low-back pain. (R. 265.) On examination, Dr. Basu

reported that Plaintiff had normal ranges of motion in her cervical spine with fifty degrees extension, sixty degrees rotation, and thirty degrees lateral bend, and showed "moderate spasm of bilateral paraspinals" and "moderate tenderness to palpitation of paraspinals." (R. 267.) Additionally, the Plaintiff had restricted range of motion in the lumbar spine with ten degrees extension, twenty degrees rotation, and twenty degrees lateral bend, and showed "moderate spasms of bilateral paralumbar musculature" and "moderate tenderness to palpitation of paralumbar musculature." (R. 267-68.) Dr. Basu noted that Plaintiff's shoulder ranges of motion and her motor testing were normal. (R. 268.) Her clinical impression was that Plaintiff had cervicocranial syndrome, lumbosacral sprain, neck sprain, right shoulder internal derangement, and traumatic Musculo-ligamentous injuries to the thoracic spines. (R. 270-71.) She recommended that Plaintiff undergo conservative physical therapy and get chiropractic and acupuncture consultations. (R. 271.) Dr. Basu's prognosis did not rule out the possibility that Plaintiff's condition could become chronic and indicated that there are significant functional limitations to the neck and back. (R. 272.) She recommended x-rays to rule out fractures and indicated that an EMG/NCV of the upper extremities would be referred if the neuropathy pain and weakness continued. (R. 271.)

On October 8, 2009, Plaintiff met with Dr. Igor Stiler, a neurologist at Premier Neuromed Service, and complained of neck pain with radiation into the upper extremities. (R. 213.) Plaintiff underwent EMG, motor nerve, sensory nerve, and FWave/HReflex tests. (R. 273-74.) The electrodiagnostic results indicated "evidence of a right C8 radiculopathy and a bilateral median neuropathy." (R. 274.)

MRIs of Plaintiff's lumbar and cervical spines taken on October 3, 2009 and October 30, 2009, respectively, indicated "[d]iffuse bulging with superimposed posterior protruded disc herniation L5-S1 level with associated annular tear of the posterior annular fibers at this level" and "[p]osterior protruded disc herniation C4-C5, C5-C6, and C6-C7 levels" and "[a]nterior protruded disc herniations with adjacent spondylitic change C5-C6 and C6-C7 levels and tonsillar ectopia noted." (R. 199-202.)

On November 5, 2009, Dr. Elliot Strauss, a chiropractor at Hempstead Family Chiropractic Group, filled out a disability certificate for Plaintiff, certifying that she was totally disabled due to the injuries she sustained in her accident at work and was unable to work beginning November 4, 2009.[3] (R. 264.)

_____

[3] The record lacks any reports by Dr. Strauss indicating examinations of the Plaintiff prior to this November 5, 2009

III. <u>Medical Evidence After The Alleged Onset Date</u>

On the referral of Dr. Strauss, Plaintiff returned to Dr. Soffer for another V-sNCT test of her cervical spinal nerve roots on November 5, 2009. (R. 241.) Her test results were normal (R. 242) and on December 2, 2009 Dr. Soffer confirmed her diagnosis of cervical radiculopathy. (R. 243.) Plaintiff had a second V-sNCT test of her lumbrosacral nerve roots on January 12, 2010, detecting Hypoesthesia at "five of fourteen sites tested" supporting an electrophysiologic diagnosis of lumbar radiculopathy. (R. 246.) He once again noted that these "findings objectively document the sensory symptomology described by the patient." (R. 246.)

On February 4, 2010, Dr. Peter Stefanides performed a consultative examination of Plaintiff on the referral of the Division of Disability Determinations. (R. 207-10.) At the time, Plaintiff complained of lower back pain ranging from a 6-10/10 in severity, which radiated into her legs and was aggravated by prolonged standing/walking, bending, and heavy lifting. (R. 207.) She also reported neck pain at an average

---

certification of disability. He is, however, listed as the referring physician for her October 2009 MRIs. (R. 199.) Some of his reports for examinations are dated October 19, 2009; however, these reports refer to the November 5, 2009 finding of disability, indicating that they reflect examinations after that date (296-309). The Court has thus interpreted Dr. Strauss' reports to reflect examinations on dates consistent with the "date of examination" listed therein.

of 8/10 in severity, ongoing headaches, and right sided foot pain at a 10/10 severity, aggravated by prolonged walking, prolonged standing, and climbing up stairs. (R. 207-08.) Dr. Stefanides reported that she appeared to be in no acute distress and could walk on her heels and toes without difficulty. (R. 208.) He also reported that Plaintiff had a "full range of [motion in her] shoulders bilaterally," no joint inflammation, effusion, or instability, and 5/5 strength in the proximal and distal muscles. (R. 209.) He determined that her lumbar spine had seventy degrees of flexion, five degrees of extension, twenty degrees of lateral bending, and twenty degrees of lumbosacral rotation bilaterally, and that her cervical spine had thirty degrees of flexion/extension, sixty degrees of rotation bilaterally, and thirty degrees of lateral bending bilaterally. (R. 208-09.) He found a full range of motion of the knees, hips, and ankles bilaterally, and "right sided ankle pain with passive range of motion." (R. 209.) His diagnosis was "[o]ngoing lower back, right hip, neck and right foot pain," and he indicated that Plaintiff's prognosis is guarded. (R. 209.) He also noted that "[t]he claimant has mild restrictions with prolonged standing, walking, bending, heavy lifting, climbing up stairs and neck twisting." (R. 209.)

On March 3, 2010, Dr. M. Pagan completed a Physical Residual Functional Capacity Assessment for the Social Security

Administration to determine Plaintiff's physical limitations or restrictions. (R. 225-30.) Dr. Pagan reviewed the evidence related to Plaintiff's disability for the period of December 15, 2009 through March 3, 2010 (R. 211-16) and reported her diagnoses to be cervical disk disease and left shoulder tendinopathy.[4] (R. 225-30.) He reported that Plaintiff could occasionally lift and/or carry twenty pounds, could frequently lift and/or carry ten pounds, and could stand, walk, or sit for about six hours in an eight-hour workday. (R. 226.) He reported no postural limitations such as climbing stairs, stooping, kneeling, or crouching. (R. 227.) Dr. Pagan answered "non-specific" when prompted to discuss whether claimant's alleged symptoms are attributable to medically determinable impairments and whether the severity of the symptoms is consistent with these impairments or other medical or non-medical evidence of disability. (R. 228.)

In addition, Plaintiff was under the care of Dr. Strauss from February 2010 through November 2010, receiving chiropractic care and physical therapy. (R. 254-59, 275-308.) He diagnosed Plaintiff with cervical radiculopathy, thoracic myalgia, and lumbosacral radiculopathy based on positive MRIs of her lumbar and cervical spines. (R. 275-76.) Dr. Strauss'

---

[4] As Plaintiff's claim has thus far only referred to symptoms in her right shoulder, the Court understands this diagnosis to be for Plaintiff's right shoulder.

regular examinations between March 1, 2010 and July 6, 2010 indicate that at the time of examination Plaintiff had 100% temporary impairment, was not working, and was unable to return to work. (R. 275-90.) One report dated both July 19, 2010 and July 27, 2010 notes that Plaintiff was 50% impaired, working, and able to work without restrictions beginning July 5, 2010 contradicting his July 6, 2010 report. (R. 291-92.) Dr. Strauss' reports dated September 7 and September 17, 2010 indicate that Plaintiff was 100% impaired, yet working with no restrictions. (R. 295-96.) In his most recent reports between September 20, 2010 and November 30, 2010, Dr. Strauss stated that Plaintiff was 50% impaired and yet working with no restrictions noted. (R. 297-304, 306-09.)

On September 8, 2010, Plaintiff returned to Dr. Langan complaining of continued pain in her right shoulder. (R. 305.) He gave her Marcaine and Depo-Medrol injections, indicating that insufficient improvement may show the need for another MRI. (R. 305.) Plaintiff returned to Dr. Langan on November 24, 2010 with ongoing pain on the right side, which he believed to be cervical radiculitis. (R. 305.) He suggested that she consider disc decompression before going to pain management. (R. 305.)

On December 9, 2010, Dr. Langan completed a Doctor's Narrative Report for the Workers Compensation Board concerning Plaintiff's diagnosis. (R. 310-11.) He listed his diagnosis as

"unspecified D/O of Tendon Shoulder" and "rotator cuff strain" and opined that her temporary impairment was 50%. (R. 311.) On December 22, 2010, he completed an RFC questionnaire for the purposes of Plaintiff's disability claim based on his treatment of her right shoulder. (R. 312.) He indicated that her impairment has not lasted and cannot be expected to last at least twelve months, that she can frequently lift six to ten pounds, that she can lift a maximum of twenty-one to fifty pounds, and that she can stand, sit, or walk for up to six hours in an eight-hour workday. (R. 314.) He indicated that she could stoop, crouch, kneel, bend, climb, or balance only occasionally, up to 1/3 of an eight-hour workday. (R. 314.) He also indicated Plaintiff's trouble turning her head due to her disk herniation (R. 314) and noted that Plaintiff had trouble performing functions such as stretching, reaching, grasping, pushing, or pulling with her right arm due to cervical radiculopathy and trouble with fine manipulations with the right hand (R. 315). He noted that Plaintiff could walk ten blocks without stopping and can travel alone by bus or subway, but opined that Plaintiff has to lie down during the day to take pressure off her foot. (R. 315.)

Plaintiff then saw Dr. David R. Adin, D.O. on December 21, 2010 with a chief complaint of neck pain and also complaining of right upper extremity pain and neurological

16

symptoms, low-back pain, and right and left lower extremity pain. (R. 317.) He found "[o]blique extension-based pain is positive to the right, positive to the left and moderate to severe," "[m]yofascial trigger points to the bilateral cervical paraspinal and bilateral periscapular," and "myofascial trigger points to the bilateral lumbar paraspinal muscles." (R. 318.) His diagnosis was myofascial pain syndrome in the cervical spine, cervical HNP, lumbar herniated nucleus pulposus, and myofascial pain syndrome in the lumbar spine. He recommended diagnostic/therapeutic epidural steroid injection: caudal esi and cervical interlaminar esi. (R. 319.)

IV. <u>Decision by the ALJ</u>

After reviewing all of the above evidence, the ALJ issued his decision on February 11, 2011, finding that Plaintiff was not disabled. (R. 10, 19.)

The ALJ gave little weight to chiropractor Dr. Strauss' opinion, finding that it is not in accord with the clinical evidence of record, and also noting that a chiropractor falls under the category of "other treating source" by the regulations of 20 C.F.R. § 404.1513. (R. 17.) The ALJ gave weight to Dr. Langan's functional assessment only as it was consistent with the overall medical evidence of record, and gave "little, if any, weight" to Dr. Langan's statement that Plaintiff needs to lie down during the day, as it "is in no way

supported by the record." (R. 17.) The ALJ afforded weight to Dr. Stephanides' finding of no disability and his finding that Plaintiff can engage in at least sedentary work with only "mild restrictions," "as his conclusions are in accord with the medical evidence of record as well as his own examination findings." (R. 18-19.) The ALJ commented that Dr. Adin's findings of decreased range of cervical motion, cervical spasm, and decreased range of lumbar motion were "pertinent," but that the doctor failed to note findings preclusive of work. (R. 17.) The ALJ did not discuss the treatment and findings of Dr. Michaels or Dr. Jaghab, and did not mention the results of the V-sNCT tests in his decision. With respect to Plaintiff's complaints of injury to her neck, right shoulder, and back, the ALJ found that while her "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [her] residual functional capacity assessment." (R. 18.)

        The ALJ found that although Plaintiff is unable to perform any past relevant work, considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 18.) He based this conclusion

on his finding of Plaintiff's residual functional capacity for the "full range of sedentary work."  (R. 19.)

After the ALJ issued his decision, Plaintiff requested review by the Appeals Council.  At that time, the Commissioner submitted new evidence relating to Plaintiff's substantial gainful activity to the Appeals Council for review.  That evidence revealed that Plaintiff earned $3,229 in the third quarter of 2010, $3,690 in the fourth quarter of 2010, and $3,097 in the first quarter of 2011, averaging over $1,000 monthly.  (R. 1-2, 326-27.)

The Appeals Council considered Plaintiff's reasons for disagreeing with the ALJ's decision and determined that the information did not provide a basis for changing the ALJ's decision.  (R. 1-2.)  Additionally, the Appeals Council found that Plaintiff's continuing employment qualifies at substantial gainful employment.  (R. 2.)

## DISCUSSION

### I.  Standard of Review

In reviewing the ruling of the ALJ, this Court will not determine de novo whether Plaintiff is entitled to SSI or DIB.  Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ.  See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Instead, this Court must determine whether the ALJ's findings

are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotations marks and citation omitted), superseded by statute on other grounds, 20 C.F.R. § 404.1560. Where the ALJ has applied incorrect legal principles in evaluating the evidence, the Court may refuse to uphold the Commissioner's decision. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." Id. (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts. See id.

To determine if substantial evidence exists to support the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted). New evidence that relates to the period on

or before the ALJ's decision and is submitted to and evaluated by the Appeals Council is part of the administrative record for judicial review.  See Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).

## II.  Eligibility for Benefits

To be eligible for DIB, a claimant who is a U.S. citizen must be insured for disability benefits at the time of the alleged disability onset, must not have reached the age of retirement, must file for disability insurance benefits, and must be disabled within the meaning of the Social Security Act ("the Act").  See 42 U.S.C. § 423(a)(1).  To be eligible for SSI benefits, an individual must meet the specified income and resource requirement of the Act and must have a disability within the meaning of the Act.  See 42 U.S.C. § 1381a.  The Plaintiff's disability is the only component contested in the present case; as such the Court will only address the issue of whether the Plaintiff is disabled.

A claimant is disabled under the Act when she can show an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C.

§ 1382c(a)(3)(A). The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." Id. § 1382c(a)(3)(B). "Under the governing regulations, the duration requirement to establish disability will not be met where a claimant undertakes substantial gainful activity within 12 months after the onset of the impairment at issue and before receiving any notice of determination or decision finding disability." Rainero v. Astrue, No. 08-CV-4266, 2011 WL 1327700, at *1 (E.D.N.Y. Mar. 31, 2011) (internal quotation marks and citations omitted).

The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act. See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i); 20 C.F.R. § 416.920 (a)(4)(i). Second, the claimant must prove that he or she suffers from a severe impairment that significantly limits his or her mental or physical ability to do basic work activities. Id. § 416.920(a)(4)(ii). Third, the claimant must show that his or her impairment is equivalent to one of the impairments listed in Appendix 1 of the Regulations. Id. § 416.920(a)(4)(iii).

Fourth, if his or her impairment or its equivalent is not listed in the Appendix, the claimant must show that he or she does not have the residual functional capacity to perform tasks required in his or her previous employment. Id. § 416.920(a)(4)(iv). Fifth, if the claimant successfully makes these showings, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. Id. § 416.920(a)(4)(v). The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). The five-step analysis is sequential, and "if an individual is found to be disabled (or not) at any step, the Commissioner is not required to proceed to the next step." Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000). "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms . . . ; and (4) the claimant's educational background, age, and work experience." Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003).

In the present case, the ALJ performed the above analysis and first found that Plaintiff had not engaged in

substantial gainful activity since the alleged onset date, although her earnings were just barely under the threshold. (R. 15.) He then found that Plaintiff has severe cervical, right shoulder, and lumbar impairments. (R. 15.) The ALJ next determined that neither the Plaintiff's impairments nor a medical equivalent was among those enumerated in Appendix 1 and then preceded to determine whether Plaintiff retained the residual functional capacity to perform her past work as a security guard. (R. 15.) The ALJ found that although Plaintiff was not capable of performing her past work, she had the residual functional capacity to perform sedentary work. (R. 15-18.)

The Court must determine whether the ALJ's decision is based on the correct legal principles and supported by substantial evidence.

III. Substantial Gainful Activity

The primary consideration when determining whether a plaintiff is engaged in substantial gainful activity is the earnings derived from work activity. 42 U.S.C. § 404.1574. The threshold level of earnings to show substantial gainful activity for 2010, the time of Plaintiff's ALJ hearing, was $1,000 per month. See Substantial Gainful Activity, Soc. Sec. Admin., http://www.ssa.gov/oact/cola/sga.html (last visited June 24, 2013). Earnings in excess of this minimum raise the presumption

that a Plaintiff is not disabled within the meaning of the Act. See Storyk v. Sec'y of Health, Educ., & Welfare, 462 F. Supp. 152, 157-58 (S.D.N.Y. 1978). The Plaintiff bears the burden of establishing that despite surpassing the established level of earnings, she was not engaged in substantial gainful activity. See Figueroa-Plumey v. Astrue, 764 F. Supp. 2d 646, 650 (S.D.N.Y. 2011) (citing 20 C.F.R. § 404.1512(a)).

Courts have held that "[n]either the type of work performed nor part-time status is relevant to the limit on earnings." Powers v. Apfel, No. 98-CV-4736, 1999 WL 493354, at *3 (S.D.N.Y. July 12, 1999).[5] Factors that rebut a presumption of ability to work at the substantial gainful activity level are Plaintiff's inability to perform work "satisfactorily without more supervision or assistance than is given other people performing similar work," and Plaintiff's need to work under special conditions, which include but are not limited to:

(1) [being] required and receiv[ing] special assistance from other employees in performing your work;

(2) [being] allowed to work irregular hours or take frequent rest periods;

---

[5] In some instances, "sporadic" work activity has rebutted the presumption of substantial gainful activity, but only when the Plaintiff has shown that the work history is transitory or nearly nonexistent. See Storyk, 462 F. Supp. at 158 ("Working only several months over a period of several years because of severe pain and refusing permanent jobs because of that pain, clearly rebut[s] the presumption raised under the regulation.").

(3) [being] provided with special equipment or were assigned work especially suited to your impairment;

(4) [being] able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work;
(5) [being] permitted to work at a lower standard of productivity or efficiency than other employees; or

(6) [being] given the opportunity to work despite your impairment because of family relationship, past association with your employer, or your employer's concern for your welfare.

20 C.F.R. § 404.1573(c).

Plaintiff testified at the ALJ hearing in December 2010 that she had been working "twenty hours, sometimes 28" per week, since July 2010 at a rate of $12.29 per hour. (R. 29.) Given that testimony, the ALJ determined that Plaintiff's earnings were just below the threshold for substantial gainful activity levels for 2010 and concluded that her work activity did not rise to the level of substantial gainful activity. (R. 15.)

The new evidence submitted to the Appeals Council, however, indicates that Plaintiff's earnings were $3,229 for the third quarter of 2010, $3,690 for the fourth quarter of 2010, and $3,097 for the first quarter of 2011, averaging just over $1,000 per month (R. 326) and therefore slightly above the threshold earnings level to determine substantial gainful

activity. The Appeals Council specifically noted this evidence and determined that Plaintiff's "continuing employment qualifies as substantial gainful employment . . . ." (R. 2.) "[W]hen, as here, the Appeals Council denies review after considering new evidence, [the] Court simply reviews the entire administrative record, including the new evidence, and determines . . . whether there is substantial evidence to support the decision of the Commissioner." Sobolewski v. Apfel, 985 F. Supp. 300, 311 (E.D.N.Y. 1997) (internal quotation marks and citation omitted).

The Court finds here that there is substantial evidence to support the Commissioner's decision. Plaintiff submitted no evidence to rebut the presumption that her earnings are sufficient to indicate substantial gainful activity. Plaintiff testified that although she used to pick up the belongings she searched in her job as a security guard, after her injury she no longer picks up these items, but "just ask[s] them to sit the bag on the table, open it, and move their property around inside the bags" to avoid straining. (R. 31.) There is no other evidence in the record showing a change in Plaintiff's job performance after her alleged onset date. In fact, in Plaintiff's disability report, she indicated that although her injuries caused her to work fewer hours, they did not cause her to change job duties. (R. 96.) There is no indication in the record that this minor change in job

performance is suggestive of an inability to perform satisfactorily, and Plaintiff has made no showing that she works under any special conditions, including those specified in 20 C.R.F. § 404.1573.

Furthermore, Plaintiff's onset date is November 4, 2009, but the new evidence demonstrates that she was substantially gainfully employed beginning in the third quarter of 2010. Accordingly, she was not unable to engage in substantial gainful activity for a continuous period of twelve months, as required. See <u>Nappa v. Sec'y of U.S. Dep't of Health & Human Servs.</u>, 731 F. Supp. 579, 585 (E.D.N.Y. 1990) ("[S]ince [plaintiff's] substantial gainful activity was undertaken before the lapse of twelve continuous months from the onset of her injury, she is not entitled to disability benefits.").

[BOTTOM OF PAGE INTENTIONALLY LEFT BLANK]

CONCLUSION

For the foregoing reasons, Defendant's motion for judgment on the pleadings is GRANTED, and the final decision of the Commissioner is AFFIRMED. Accordingly, Plaintiff's Complaint is DISMISSED.

The Clerk of the Court is directed to send a copy of this Memorandum and Order to pro se Plaintiff and mark this matter CLOSED.


SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     August __16__, 2013
           Central Islip, NY